Barbara A. HESS, Patrick F. Samples, Larry G. DeClue, Clyde L. Daniels, David McClain, Robert E. Appleby and David Lee Merritt, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

The ST. JOSEPH POLICE PENSION FUND, an unincorporated association and its trustees and members; Marvin Atkins III; James R. Hays; Ronald E. Fisher; Donald Conroy; Tony Marsola; Mary S. Parker, Director of Finance; James O. Turner, City Attorney; Walter T. Welsh, City Clerk; and The City of St. Joseph, Missouri, Trustees of The St. Joseph Police Pension Fund, individually, jointly, and as class representatives of the members, contributors, officers, directors, trustees, stakeholders and beneficiaries of said unincorporated association, Defendants.

No. 83–6074–CV–SJ.

United States District Court,
W.D. Missouri,
St. Joseph Division.

April 4, 1985.

Ronald M. Sokol, St. Joseph, Mo., for plaintiffs.

Richard Steinberg, Asst. City Atty., St. Joseph, Mo., for defendants.

## ORDER

SACHS, District Judge.

As stated in the Order of January 14, 1985, the parties have agreed to submit this case on the basis of exhibits heretofore offered into evidence, the stipulation of facts, the pretrial order, relevant statutes, constitutional provisions, case law, and the parties' briefs. The parties have now completed all briefing. Thus, this case is ready for resolution.

Prior to November of 1961 St. Joseph, Missouri, operated pursuant to § 72.010, RSMo (repealed 1975) as a first class city. Stipulation of Facts No. 1 (filed October 12, 1984) ("Stip."). While operating as a first class city the St. Joseph Police Department and the City of St. Joseph established the St. Joseph Police Pension Fund ("Fund") pursuant to §§ 86.510–86.577, RSMo. (Stip. 2.)

At the election of October 31, 1961, certified November 6, 1961, St. Joseph adopted its first city charter. (Stip. 3.) Section 7.8 of that charter provided that "[a]ll existing retirement plans shall be continued. Additional retirement plans may be established for any department or agency as authorized by the Constitution or by law, but only after submission to and adoption by the voters." (Stip. 4.) As of the date of this opinion, no election has subsequently been held concerning adoption of a police pension fund. (Stip. 5.)

No written rules, regulations, standards, or policies have been adopted by the Fund's Board of Trustees ("Board") subsequent to the adoption of the first charter. (Stip. 6.) St. Joseph police officers who were in the Fund at the time of the adoption of the first charter were required to continue in the Fund thereafter. (Stip. 7.) All physically qualified officers joining the St. Joseph Police Department after the adoption of the first charter have been required to participate in the Fund. (Stip. 8.) Some physically disqualified officers, however, were admitted to the Fund on "waivers." *Id.* Officers over age or physically disqualified from the Fund have been provided with alternate pension rights under the Missouri Local Government Employees Retirement System ("LAGERS") program (§ 70.605 RSMo) which was open to other city employees. *Id.* Police officers who qualified for the Fund have not been allowed to participate in the LAGERS program. *Id.* The LAGERS program was created in 1967, L.1967, p. 141, § 2, and is designed to apply to local employees not included in "any other plan similar in purpose." § 70.600(10)(a), RSMo. Not all police officers have been advised prior to their employment that participation in the Fund was required. *Id.* This failure to advise appears to have been inadvertent; there is no record of any such unadvised officers having made an objection at the time deductions for the benefit of the Fund were taken from their paychecks. Pretrial Order at 4 (filed December 14, 1984). All Fund participants have been required to contribute to the Fund from their gross pay. (Stip. 8.) The St. Joseph Finance Department has routinely withheld contributions from the Police Department payroll for the benefit of the Fund. *Id.* The City has also contributed to the Fund. *Id.* All donations and receipts from vending machines at the Police Department have routinely been deposited in the Fund. (Stip. 9.) For the last six years rewards have been deposited in the Fund. *Id.*

Officers leaving the Police Department and Fund with less than five years service have been denied refund of any monies contributed or interest thereon. (Stip. 10.) A complete limitation on refund rights for short-term police force employees was initially enacted in 1961. *See* § 86.523 RSMo and Historical Note in 6 V.A.M.S. Officers leaving the Police Department and Fund with more than five years and less than twenty-five years of service have been refunded two-thirds of their contributions, but have been denied refund of the balance or interest thereon. (Stip. 11.) In the discretion of the Board, officers returning to the Police Department have been allowed to "tack" periods of service in the Police Department and Fund. (Stip. 12, Pretrial Order at 4.)

Other City employees participating in the LAGERS program are paid their accumulated contributions in full when their City employment ceases, unless they retire and receive benefits thereby. (Stip. 13.) LAGERS participants may not receive benefits until they reach age sixty-five. Pretrial Order at 5. Fund participants need only serve twenty-five years in the Police Department, regardless of age, before receiving Fund benefits. *Id.*

All lay members of the Board, as reflected by the Board's minutes, correspondence, and public utterances, and the City Attorney's office as legal advisor to the Fund, believed and publicly represented that §§ 86.510–86.577 RSMo governed the operation of the Fund until advised of the theories and authorities asserted by plaintiffs' counsel in late 1982 and early 1983. Pretrial Order at 3–5.

The St. Joseph City Council and the Board have never received any actuarial or other form of evidence justifying differences in refund policies to members of the Fund based upon years of service. *Id.* Defendants have no actuarial or other evidence justifying the existing differences in refund policies of the Fund. *Id.*

The only ordinance adopted by the St. Joseph City Council concerning the Fund is § 2–88.[1] (Stip. 14.) Subsections (a) and (b) predate the first city charter. *Id.* Subsection (c) was enacted on December 6, 1976. *Id.* City ordinance § 2–87, also predating the first charter, authorizes the Director of Finance to withhold pension fund assessments from Fund members' wages. (Stip. 15.)

On August 4, 1981, an election was held adopting a new charter for the City of St. Joseph. (Stip. 16.) The new charter included the following section:

16.2 Ordinances to Remain in Force.

All ordinances, regulations and resolutions in force at the time this Charter takes effect, which are not inconsistent with the provisions of this Charter, shall remain and be in force until altered, modified, or repealed by or under authority of this Chapter or ordinance.

*Id.*

Civilian employees of the Police Department are denied membership or participation in the Fund and are LAGERS participants. (Stip. 17.)

## I.

In this class action plaintiffs, former police officers, contend that they were denied their property without due process of law; that they were denied equal protection under the law; and that they have had their property taken for public use without due process of law or just compensation by certain acts of defendants under color of state law in violation of the protections guaranteed plaintiffs under the Fifth and Fourteenth Amendments to the United States Constitution. Specifically, plaintiffs claim as damages their contributions to the Fund while employed as St. Joseph police officers together with interest on their contributions. These contributions have been withheld either in whole or in part: Officers leaving the Police Department within five years received no refund and officers leaving after five years received a refund of two-thirds of the amounts they had contributed. Neither group received interest on their contributions. The action is for

---

**1.** Section 2–88 *Pension fund for police.*

(a) *Establishment.* There shall be a pension fund for the pensioning of retired, crippled and disabled members of the police department and the dependent widows and minor children of deceased members.

(b) *Operation.* Said pension fund shall be managed by a board of trustees with the director of finance of the city as the treasurer of said fund, and shall organize and operate in a manner and within the limits provided by the Constitution and laws of the state.

(c) *Municipal contributions.* Beginning with the fiscal year 1977–1978 and each fiscal year thereafter, there shall be set apart and paid to the board of trustees of the police pension fund a municipal contribution which shall be equal per capita for each member of the police pension fund to the municipal contribution per capita for each member of the firemen's pension fund to the board of trustees of the firemen's pension fund. *Id.*

damages pursuant to 42 U.S.C. § 1983 and attorney's fees pursuant to 42 U.S.C. § 1988.

The federal issue before the court is whether the refund policies of the Fund deny plaintiffs due process or equal protection under the law.[2] The Fifth Circuit in *Muzquiz v. City of San Antonio*, 520 F.2d 993 (5th Cir.1975), *aff'd on other grounds*, 528 F.2d 499 (5th Cir. en banc 1976), *vacated and remanded*, 438 U.S. 901, 98 S.Ct. 3117, 57 L.Ed.2d 1144, *aff'd on original grounds*, 586 F.2d 529 (5th Cir. en banc 1978) (per curiam), dealt with a similar question. In *Muzquiz*, former San Antonio policemen and firemen challenged the operation of the city's firemen's and policemen's pension fund, and sought refunds of amounts they had contributed while they were serving. The opinion of Judge Tuttle ruled that none of the plaintiffs' constitutional claims had merit. 520 F.2d at 1001. The court held first that

> there was no "taking" which would require compensation. While the plaintiffs contributed to the Pension Fund, they in turn received protection in the event of death or disability far in excess of their contributions. This protection continued so long as they remained employed as firemen or policemen. They thus enjoyed the benefits of their contributions during the term of employment, and no other compensation is due them.

*Id.* Second, the court rejected plaintiffs' argument that they were denied equal protection since other civil employees in San Antonio were not required to participate in the same pension program and since police and firemen in small Texas towns were not similarly affected by the Texas statute. Judge Tuttle wrote:

> While it is true that the plaintiffs were treated differently from certain other

public employees, it does not seem to us that this difference was in any way irrational or a violation of equal protection. Certainly as a class, policemen and firemen in San Antonio cannot be considered as a "suspect class," thus requiring strict scrutiny of the legislative purposes for the difference in treatment. Nor could the interest the plaintiffs assert in their contributions to the Pension Fund be thought of as some fundamental personal right. Absent a suspect classification, or an infringement on some fundamental right, a classification is deemed permissible if it is found to have a "reasonable relationship" to a legitimate governmental interest.

*Id.* (Footnotes omitted.) *Cf. Reeder v. Kansas City Board of Police Commissioners*, 733 F.2d 543, 549 (8th Cir.1984) (remand ordered on equal protection issue involving important First Amendment rights—political contributions—because the type of classification involved "may require more than simply a rational basis to withstand constitutional attack."). *See also Beverlin v. Board of Police Commissioners of Kansas City, Missouri*, 722 F.2d 395, 396 (8th Cir.1983).

In the case at bar, defendants assert that the distinction between those officers serving less than five years and those serving over five years "motivates those on the force to serve, after education and training, for at least five years. A trained officer, one who has served on a police force for several years, provides leadership for the remainder of the force and provides the public with the benefits of his long experience." Defendants' Trial Brief at 15. Defendants further explain the difference between members of the Fund and those in LAGERS: "Police officers can retire at a much earlier age under their plan than can

---

**2.** The court acknowledges that it might be possible to avoid a constitutional ruling by holding that the Fund operation is not authorized by state law, for reasons mentioned below. Because of the importance and delicacy of the state law issues, the court might defer this ruling while plaintiffs resort to the state courts. This would unduly delay resolution of a two-

year old case. Moreover, it seems probable that the Fund operations enjoy at least *de facto* status, although conceivably being subject to future judicial direction for technical lack of current authority under state law. *Buckley v. Valeo*, 424 U.S. 1, 142–43, 96 S.Ct. 612, 693, 46 L.Ed.2d 659 (1976); *Cherry v. City of Hayti Heights*, 563 S.W.2d 72 (Mo.1978).

the city employees under LAGERS ..." *Id.* at 16.

■ That these may be post hoc rationalizations is not dispositive. The distinctions were created by a statutory plan drawn by the Missouri legislature. *See* § 86.523, RSMo. Section 86.523 applies to first class cities and provides that

> [i]n the event of resignation or dismissal from the force, any member who has faithfully served at least five years and less than twenty-five years in the department shall receive a refund from the pension fund of all moneys he may have heretofore paid in as salary contribution, except thirty-three and one-third percent of his salary contribution the member shall have paid into the fund, except that no refund shall be made from the fund because of the death or retirement of members or when the resignation or dismissal of a member was occasioned or required by the culpable misconduct of the member.

Section 86.537 allows for the trustees to pay disabled members from the Fund. Sections 86.540 and 86.543 provide for the pensions of police officers after twenty-five and twenty years, respectively. Section 86.547 grants certain benefits to widows and dependent children. Finally, § 86.557 permits an appropriation for funeral expenses. All of these sections demonstrate the legislature's special concern for police officers in first class cities. *See Muzquiz,* 520 F.2d at 1002. Although designed for one group of employees, the plan is not unreasonable and establishes no invidious distinctions. Simply because another session of the General Assembly adopted other reasonable provisions for other groups of municipal employees not already covered creates no constitutional violation. More uniform treatment of all municipal employees as a group may be legislatively desirable, but is not mandated by the Equal Protection Clause. At worst the difference in legislation can be characterized as an accident of history or an "historical anomaly" (Reply Brief, p. 4). Plaintiffs have not shown, however, that under current constitutional law the courts require that all new legislation in economic matters make perfect sense, when compared with other legislation on arguably related subjects. On the contrary, the test of reasonableness provides a wide target for legislative action.

■ Plaintiffs seem to argue that when the LAGERS system was enacted in 1967, previously existing pension plans for local employees should have been terminated as to new employees or revised to conform with the most current legislative view of ideal fairness and reasonableness. The difficulties in reopening and revising existing plans, without causing new controversy, may be judicially noticed. Where purely economic interests are involved, there appears to be neither reason nor authority for the court to conclude that the General Assembly in 1967 engaged in unconstitutional classification when it enacted legislation differing from and inapplicable to existing, reasonable local employee pension plans. Nor was the City of St. Joseph constitutionally required to change the police officers' pension plan to bring it into conformity with a subsequent plan adopted for the benefit of other city employees.

■ Plaintiffs also argue, without citing authority, that it is constitutionally prohibited to have pension fund provisions for police officers in St. Joseph that differ from the provisions of such funds for police officers in larger and smaller communities in Missouri. The court is aware that a logically related claim of discrimination between police officers in different Missouri cities is pending before Chief Judge Wright, on remand from the court of appeals. *Reeder v. Kansas City Board of Police Commissioners,* 733 F.2d 543, 548–9 (8th Cir.1984). As Judge Arnold noted in remanding that case, the political contribution issue there presented involves First Amendment rights, and the justification "may require more than simply a rational basis to withstand constitutional attack." The present case, however, is subject to less critical scrutiny, and different but rea-

sonable laws can readily be justified by concepts of local self-government.

Home rule charters are adopted by cities and counties in Missouri for the very purpose of avoiding uniformity dictated from Jefferson City. City managers in Kansas City can thus be paid twice as much, or half as much, as County Executives in St. Louis County. While the Missouri Constitution forbids "special legislation" (Art. III, § 40(30) as a refinement on the Equal Protection Clause, this has rarely prevented legislation tailored to the needs of a single community, or small group of municipalities, as perceived by local lobbyists and representatives. E.g. *Walters v. City of St. Louis,* 364 Mo. 56, 259 S.W.2d 377 (1953) (St. Louis earnings tax), *aff'd.* 347 U.S. 231, 74 S.Ct. 505, 98 L.Ed. 660 (1954) without expressly considering the issue of inter-city discrimination; *Herald Co. v. McNeal,* 511 F.Supp. 269, 275 (E.D.Mo. 1981) (St. Louis closure of police records), summarily dispatching equal protection contention based on inter-city differences, without discussion, on remand from *Herald Co. v. McNeal,* 553 F.2d 1125, 1128 (8th Cir.1977). Variety is inherent in such specialized legislation, and unexplained differences do not, in themselves, violate the Equal Protection Clause.

■ When a *comprehensive* statute has inexplicable provisions, however, denying economic benefits to persons who are obviously similarly situated, an Equal Protection challenge may sometimes be sustained. *Ranschburg v. Toan,* 709 F.2d 1207 (8th Cir.1983). But where legislative classifications have been established, on a population basis or otherwise, differences in legislation governing the economic rights and obligations of public employees, in accordance with the classifications, doubtless can generally be given constitutional approval as "not invidious but sanctioned and indeed conventional." *Nashville, C. & St. L. Ry. v. Browning,* 310 U.S. 362, 370, 60 S.Ct. 968, 972, 84 L.Ed. 1254 (1940) (sustaining

variations in assessment rates for different classes of property).

Judicial insistence on a unifying rationale would defeat a major purpose of classification. Classifications are at least partly intended and are normally used to liberate governmental units from state-wide uniformity across classification lines.[3]

## II.

■ Plaintiffs further argue that all of the sections dealing with first class cities are inapplicable in this case since St. Joseph adopted a constitutional charter form of government. Plaintiffs cite *Leoffler v. Kansas City,* 485 S.W.2d 633, 634 (Mo.App. 1972), *vacated on other grounds,* 557 S.W.2d 656 (Mo.App.1977), for the proposition that "where a statute refers to a first class city, it has no application to a city operating under the charter form of government." In *Leoffler* plaintiff sued for damages for fire loss resulting from mob violence in Kansas City, based upon a statute which held that cities of the first or second class were liable for such damages. Kansas City, however, had elected a charter form of government, and was not within the statutory classification. Thus, the Missouri Court of Appeals held that the statute was not applicable. That case has no bearing on the present issue, where the procedures in question were adopted and used prior to adoption of the charter.

The precise issue presently before the court does not appear to have been previously decided by any Missouri court. Article VI, § 19(a) of the Missouri Constitution provides that:

[a]ny city which adopts or has adopted a charter for its own government, shall have all powers which the general assembly of the state of Missouri has authority to confer upon any city, provided such powers are consistent with the constitution of this state and are not limited or denied either by the charter so adopted or by statute. Such a city shall, in addi-

---

**3.** This is not to say that specialized legislation can always be sanctioned, against an Equal Protection challenge, where civil liberties are at stake, or the discrimination may be otherwise subject to strict scrutiny, as in the pending case before Chief Judge Wright.

tion to its home rule powers, have all powers conferred by law.

Thus, if the Missouri legislature had conferred upon St. Joseph the power to withhold money from plaintiffs' paychecks for purposes of the Fund and to condition refunds upon the plaintiffs working for five years, the Funds' actions to so withhold and condition refunds would be lawful. *Cf. State ex rel. Sanders v. Cervantes,* 480 S.W.2d 888, 893 (Mo. banc 1972); *State ex rel. St. Louis Fire Fighters Ass'n. Local No. 73, AFL–CIO v. Stemmler,* 479 S.W.2d 456, 459–64 (Mo. banc 1972); *In re Schrader,* Mo. Att'y.Gen.Op. No. 219 at 3 (Oct. 27, 1972). This power to withhold and refund monies does not mean that the legislature could necessarily compel the Fund to follow certain policies. Article VI, § 22 of the Missouri Constitution states that:

> [n]o law shall be enacted creating or fixing the powers, duties or compensation of any municipal office or employment, for any city framing or adopting its own charter under this or any previous constitution, and all such offices or employments heretofore created shall cease at the end of the terms of any present incumbents.

Whether the pensions involved in this case would fall within § 22's proscription is an open question. See generally *City of St. Louis v. Grimes,* 630 S.W.2d 82, 83–85 (Mo. banc 1982), and cases cited therein. Although the court may have pendent jurisdiction over the issue, in the interests of comity and federalism, the court declines to make any dispositive ruling on the legality of the Fund's operation under state law.[4] Merely because the federal claims were not disposed of prior to the submission of this case on stipulated facts does not require the court to exercise pendent jurisdiction and adjudicate the state law claims. *See Almendral v. New York State Office of Mental Health,* 743 F.2d 963, 967 (2d Cir. 1984); *Weissinger v. White,* 733 F.2d 802, 807 (11th Cir.1984). The court is satisfied

that it is not abusing its discretion in dismissing the pendent state law claims. See *Verdegaal Bros., Inc. v. Union Oil Co. of Calif.,* 750 F.2d 947, 950–52 (Fed.Cir.1984), and cases cited therein. Unnecessarily ruling on such claims would impact on pension rights of present and former police officers not parties to this litigation, and would deprive the losing parties of careful review of important state law issues by the appellate courts of Missouri. If plaintiffs desire a further ruling on the Fund's legality, they should proceed in state court. *Cf. Pennhurst State School & Hospital v. Halderman,* 465 U.S 89, 104 S.Ct. 900, 920 & n. 34, 79 L.Ed.2d 67 (1984). Accordingly, it is hereby

ORDERED that judgment be entered in defendants' favor on the federal constitutional claims. The court abstains from ruling on the legality of the Fund's operations under state law.

---

**4.** In another civil rights suit involving a policemen's pension fund, the Eighth Circuit held that "[a] merely erroneous application of a state statute to a particular case does not present a ques-

tion of federal constitutional dignity." *Hirrill v. Merriweather,* 629 F.2d 490, 496 (8th Cir.1980). *See also Colon-Rivera v. Puerto Rico Dept. of Social Services,* 736 F.2d 804 (1st Cir.1984).