Wilson W. **GOODMAN**, et al., Plaintiffs,

v.

**CITY OF KANSAS CITY, MISSOURI,**
et al., Defendants.

No. 95–0130–CV–W–9.

United States District Court,
W.D. Missouri,
Western Division.

Sept. 20, 1995.

Stephen Douglas Bonney, Kansas City, MO, for Wilson W. Goodman, Hugh S. Young.

M. Margaret Sheahan Moran, City Attorney's Office, Kansas City, MO, for City of Kansas City, MO.

William D. Geary, M. Margaret Sheahan Moran, Kansas City Missouri City Attorney's Office, Law Dept., Kansas City, MO, for Larry Brown, in his official and individual capacities.

*ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT*

BARTLETT, Chief Judge.

Plaintiffs brought this case seeking an order declaring unconstitutional the City Manager's interpretation of § 126, City Charter of Kansas City, contained in Administrative Regulation Number 2–30 (A.R. No. 2–30) which prohibits City employees from using bumper stickers, buttons, and yard signs to express their opinions about candidates and issues in city elections. In addition, plaintiffs seek an order declaring unconstitutional the City Manager's interpretation of the City Charter contained in A.R. No. 2–30 that prohibits City employees from attending political fund raisers, rallies, and other gatherings.

Both plaintiffs and defendants have filed Motions for Summary Judgment.

## I. Undisputed Facts

### A. Stipulated Facts

The parties stipulate to the following facts.

The City of Kansas City, Missouri employs plaintiffs Wilson Goodman and Hugh Young in the classified service. Goodman works as a chemist for Kansas City's Water Department while Young works as a Fire Apparatus Operator with the City's Fire Department.

Defendant Kansas City, Missouri, is a municipal corporation and a political subdivision of the State of Missouri. Defendant Larry Brown serves as the City Manager.

Section 126 of the City Charter of Kansas City limits the political activities of City employees. The parties stipulate that defendant Brown, acting within the scope of his duties as City Manager of Kansas City, issued Administrative Regulation 2–30 pertaining to political activity by City employees.

Plaintiffs challenge the following parts of A.R. No. 2–30, ¶¶ 3.2 and 3.3:

[N]o City employee shall make a public display of political support of any candidate for City Council, Mayor, or person seeking retention as a Judge of the Kansas City Municipal Division of the Circuit Court. This prohibition extends to wearing buttons, displaying bumper stickers or signs, and participating in political campaign activities.

No vehicle displaying a bumper sticker urging the election or defeat of any candidate or political party may be parked in a parking lot controlled by the City.

Plaintiffs also challenge the following excerpt from a Memorandum dated January 9, 1995, to "All City employees" from City Manager "Larry Brown" regarding "Political Activity" and entitled "Political Activity by City employees: What Every Employee Needs to Know:" "(3) While off work ... a city employee may not attend fund raisers, rallies and other gatherings."

## B. *Undisputed Facts*

While not stipulated to, plaintiff Goodman has supplied the court with an affidavit. Defendants do not dispute any part of Goodman's affidavit. Therefore, I accept as true for the purposes of this motion the facts set forth in the Goodman affidavit.

According to Goodman's affidavit, he resides in Kansas City. At work, he parks his motor vehicle in the main water works's parking lot; the lot has approximately 30 parking spaces and is not restricted to City employees. Members of the public touring the water works, salesmen, and other people not employed by the City frequently park in that lot. Because of the relatively isolated location of Goodman's place of employment, he lacks a realistic alternative to parking in a parking lot not controlled by the City.

Goodman swears that if the City's Administrative Regulation on political activities did not restrict him, he would display bumper stickers and other political signs and would be interested in attending various political gatherings.

Plaintiff Young submitted no affidavits or other facts in the manner required by Rule 56, Federal Rules of Civil Procedure.

## II. *Standard for Summary Judgment*

■ Rule 56(c), Federal Rules of Civil Procedure, provides that summary judgment shall be rendered if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, it is the court's obligation to view the facts in the light most favorable to the adverse party and to allow the adverse party the benefit of all reasonable inferences to be drawn from the evidence. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Inland Oil and Transport Co. v. United States,* 600 F.2d 725, 727–28 (8th Cir.), *cert. denied,* 444 U.S. 991, 100 S.Ct. 522, 62 L.Ed.2d 420 (1979).

■ If there is no genuine issue about any material fact, summary judgment is proper because it avoids needless and costly litigation and promotes judicial efficiency. *Roberts v. Browning,* 610 F.2d 528, 531 (8th Cir.1979); *United States v. Porter,* 581 F.2d 698, 703 (8th Cir.1978). The summary judgment procedure is not a "disfavored procedural shortcut." Rather, it is "an integral part of the Federal Rules as a whole." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986); *see also City of Mt. Pleasant v. Associated Electric Cooperative, Inc.,* 838 F.2d 268, 273 (8th Cir.1988). Summary judgment is appropriate against a party who fails to make a showing sufficient to establish that there is a genuine issue for trial about an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553.

■ The moving party bears the initial burden of demonstrating by reference to portions of pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, the *absence* of genuine issues of material fact. However, the moving party *is not required* to support its motion with affidavits or other similar materials *negating* the opponent's claim. *Id.* (emphasis added).

■ The nonmoving party is then required to go beyond the pleadings and by affidavits, depositions, answers to interrogatories and admissions on file, designate specific facts showing that there is a genuine issue for trial. *Id.* A party opposing a properly supported motion for summary judgment cannot simply rest on allegations and denials in his pleading to get to a jury without any significant probative evidence tending to support the complaint. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

■ A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The evidence favoring the nonmoving party must be more than "merely colorable." *Id.,* 477 U.S. at 249, 106 S.Ct. at 2511. When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show there is

some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (footnote omitted).

The inquiry to be made mirrors the standard for a directed verdict: whether the evidence presented by the party with the onus of proof is sufficient that a jury could properly proceed to return a verdict for that party. *Anderson v. Liberty Lobby,* 477 U.S. at 249, 106 S.Ct. at 2511. Essentially, the question in ruling on a motion for summary judgment and on a motion for directed verdict is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Id.,* 477 U.S. at 251, 106 S.Ct. at 2512.

## III. *Discussion*

### A. *The Applicable Standard: The Pickering/NTEU Balancing Test*

Individuals do not automatically relinquish their First Amendment rights by accepting government employment. *Keyishian v. Board of Regents,* 385 U.S. 589, 605–06, 87 S.Ct. 675, 684–85, 17 L.Ed.2d 629 (1967). At the same time, however, the Supreme Court has recognized that legislatures "may impose restraints on the job-related speech of public employees that would be plainly unconstitutional if applied to the public at large." *See United States v. National Treasury Employees Union,* —— U.S. ——, ——, 115 S.Ct. 1003, 1012, 130 L.Ed.2d 964 (1995) (*NTEU*) (explaining that Congress possesses the constitutional authority to restrict federal employees from participating in certain speech activities). Therefore, to determine the validity of a restraint on the speech of government employees, a court must "arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734–35, 20 L.Ed.2d 811 (1968).

In order to qualify for the protection of the *Pickering* balancing test, government employee speech must involve "matters of public concern." *See Connick v. Myers,* 461 U.S. 138, 146, 103 S.Ct. 1684, 1689–90, 75 L.Ed.2d 708 (1983). A government employee's speech addresses a matter of public concern when it can be "fairly considered as relating to any matter of political, social, or other concern to the community." *Watter v. City of Philadelphia,* 55 F.3d 886, 892 (3rd Cir.1995).

Here, Kansas City seeks to restrict the public expression of City employees' views regarding City elections. This type of speech clearly involves "matters of public concern."

*Pickering* and most of its Supreme Court progeny involved disciplinary actions taken against individual employees. Therefore, the Court weighed the impact of the speech giving rise to the action on the performance of employees' responsibilities. *See Rankin v. McPherson,* 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987); *Connick,* 461 U.S. 138, 103 S.Ct. 1684. Here, the challenged regulations involve restrictions on a significant type of speech (speech about city elections) by a large number of potential speakers (all City classified employees). A specific instance of speech resulting in disciplinary action is not at issue.

Fortunately, the Supreme Court's recent decision in *NTEU* offers useful guidance on how to apply *Pickering* in such a case. *NTEU* involved a challenge by two unions and several career civil servants to § 501(b) of the Ethics in Government Act, 5 U.S.C.App. § 501(b) (1988), which prevented "officer[s] or employee[s]" of the federal government from "receiv[ing] any honorarium." The Court observed that the statute represented a "wholesale deterrent to a broad category of expression by a massive number of potential speakers" and, therefore, "[gave] rise to far more serious concerns than could any single supervisory decision." *NTEU,* —— U.S. at ——, 115 S.Ct. at 1014. The Court concluded that the government's burden is greater with respect to a broad based restriction on expression than with respect to

an isolated disciplinary action. *Id.; see also Forsyth County, Georgia v. Nationalist Movement,* 505 U.S. 123, 129, 112 S.Ct. 2395, 2401, 120 L.Ed.2d 101 (1992) (explaining that there is a "heavy presumption" against the validity of a prior restraint). The government must show that the "necessary impact on the actual operation" of government outweighs the interests of present and future employees and their potential audiences in unrestrained public employee speech on issues and candidates in City elections. *Pickering,* 391 U.S. at 571, 88 S.Ct. at 1736; *NTEU,* —— U.S. at ——, 115 S.Ct. at 1014.

### B. *Plaintiffs' First Amendment Claims*

Plaintiff Goodman desires to: 1) display bumper stickers relating to City elections; 2) post signs in his yard relating to City elections; and 3) attend political fundraisers, rallies and other gatherings related to City elections. *See* Goodman Affidavit.

According to Goodman, the three challenged·regulations violate his First Amendment rights because the City cannot demonstrate sufficient reasons for restricting his right to express himself on issues and candidates in City elections. Goodman argues that the purported benefits of the restrictions to the City cannot be demonstrated and, thus, are constitutionally impermissible.

### C. *Applying the Pickering/NTEU Balancing Test*

#### 1. *Interests of the Employees and the Public*

The employees' interests infringed upon by the regulations are identical as to each of the challenged regulations. First of all, plaintiffs argue that the challenged regulations limit unlawfully their own political expression. In various sections of their briefs, plaintiffs allege that the regulations "smother the employees' voices", render the employees "political eunuchs" (sic), and "seriously impair[ ] the right of City employees to cast meaningful and informed votes in City Council elections". (Plaintiffs' Motion for Summary Judgment at 11, 12, 20).

Plaintiffs cite the strong public policy of making available to the public a wide variety of viewpoints. "The First Amend-

ment affords the broadest protection to political expression in order 'to insure [the] unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'" *Buckley v. Valeo,* 424 U.S. 1, 13, 96 S.Ct. 612, 632, 46 L.Ed.2d 659 (1976). Courts have extended the First Amendment's protection to cover political buttons, bumper stickers, and signs. *See City of Ladue v. Gilleo,* —— U.S. ——, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994) (signs); *Connealy v. Walsh,* 412 F.Supp. 146, 154 (W.D.Mo.1976) (bumper stickers); *Smith v. United States,* 502 F.2d 512 (5th Cir.1974) (buttons). The right to express oneself about issues and candidates at election time is an essential part of our constitutional democracy. *See Williams v. Rhodes,* 393 U.S. 23, 29, 89 S.Ct. 5, 10, 21 L.Ed.2d 24 (1968) ("No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live."); *Lamont v. Postmaster General,* 381 U.S. 301, 307, 85 S.Ct. 1493, 1497, 14 L.Ed.2d 398 (1965) (Brennan, J., concurring) ("The dissemination of ideas can accomplish nothing if otherwise willing addresses are not free to receive and consider them.").

Also, under *NTEU,* I must weigh on the employees' side of the balance not only the interests of "present and future employees" in a broad range of inhibited "present and future expression," but also the interests of their "potential audiences" in receiving intentional public employee speech. *NTEU,* —— U.S. at ——, 115 S.Ct. at 1014. Numerous courts and commentators have observed that this interest is great because government employees are in a position to offer the public important insights both into the workings of government generally and into their areas of specialization. *Sanjour v. E.P.A.,* 56 F.3d 85, 91 (D.C.Cir.1995); *See, e.g., Pieczynski v. Duffy,* 875 F.2d 1331 (7th Cir.1989) ("[P]ublic employees have valuable insights and information about the operation of the government to convey."); "Developments in the Law—Public Employment," 97 *Harv.L.Rev.* 1611, 1768 (1984) ("[P]ublic employees, by virtue of their expertise and experience, are often among the citizens who are best informed ... and their opinions are thus espe-

cially valuable to the public."). In order to deprive the residents of Kansas City of the views of their own public servants on issues and candidates in City election, the City must clearly articulate countervailing interests that tip the balance in favor of regulation.

### 2. The City's Interest

Under the *Pickering/NTEU* balancing test, I must weigh the City's interest in "the effective and efficient fulfillment of its responsibilities to the public." *Connick,* 461 U.S. at 148, 103 S.Ct. at 1691.

In defense of each of the three challenged regulations, the City argues that the regulations are necessary because they help ensure a "[c]ity government that operates, and appears to [sic] to the public to operate, on an apolitical basis." Defendants' Motion for Summary Judgment at 12. Furthermore, the City claims that the regulations help prevent the rise of another period of political corruption like the Pendergast era.

Defendant argues that the challenged regulations outweigh the plaintiffs' interests in political speech because the regulations help ensure that no employee be pressured into displaying materials on issues or candidates as a condition to retaining City employment. Also, the restrictions prevent the public from misinterpreting the display of political bumper stickers or signs as being officially endorsed by the City itself. Defendants' Reply at 1–2.

A party opposing a motion for summary judgment must do more than rest "upon the mere allegations or denials of the adverse party's pleadings." Rule 56(e), Federal Rules of Civil Procedure. Rule 56(e) requires the opposing party to demonstrate the existence of a genuine issue of material fact by affidavits or as otherwise provided in this rule. Here, defendants failed to submit with their Motion for Summary Judgment affidavits, documents, depositions, or other evidence supporting their contentions that if City employees engage in the prohibited conduct there will be an adverse impact on government operations.

Defendant Kansas City argues that the challenged regulations are justified because they help prevent the rise of another Boss Pendergast Era. Beginning in the 1920s and peaking in the 1930s, Tom Pendergast manipulated and controlled virtually all of Kansas City politics through systemic graft, patronage, and corruption. *See generally* Charles R. Ashman, *The Finest Judges Money Can Buy: and Other Forms of Judicial Pollution* (1973); Lyle W. Dorsett, *The Pendergast Machine* (1968). Avoiding a repetition of the well-documented vices of the Pendergast era is a legitimate goal for the City. However, the City's conclusion that the challenged regulations will help avoid a return to the vices of the Pendergast era must be supported by facts properly presented that connect the conduct prohibited by the challenged regulations with the causes of the vices of the Pendergast era. Mere statements by the City's lawyers connecting the regulations to avoiding the vices of the Pendergast era are not sufficient.

In *Edenfield v. Fane,* 507 U.S. 761, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993), the Supreme Court required that the government demonstrate actual harm before its interest may be deemed to justify a restriction on speech. *Edenfield* concerned the regulation of commercial speech, where the courts apply a balancing test, which closely resembles the *Pickering/NTEU* balancing test. *Sanjour v. E.P.A.,* 56 F.3d 85, 91 (D.C.Cir.1995). The Court in *Edenfield* wrote that the government's "burden [of justifying the restriction] is not satisfied by *mere speculation or conjecture;* rather a governmental body seeking to sustain a restriction on ... speech must *demonstrate* that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." 507 U.S. at ——, 113 S.Ct. at 1800 (emphasis added).

In *NTEU,* the Supreme Court reaffirmed that in order to justify restrictions on employee speech, the government must demonstrate that the threatened harms from employee speech are real and that the regulations will, in fact, alleviate these harms.

When the Government defends a regulation on speech as a means to redress past

harms or prevent anticipated harms, it must do more than simply posit the existence of the disease sought to be cured.... It must demonstrate that the recited harms are real [and] not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way.

*NTEU,* ─ U.S. at ─, 115 S.Ct. at 1017 (citing *Turner Broadcasting System, Inc. v. F.C.C.,* ─ U.S. ─, ─, 114 S.Ct. 2445, 2450, 129 L.Ed.2d 497 (1994)). The Supreme Court also distinguished a case relied on by the defendants, *Civil Service Comm'n v. Letter Carriers,* 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973), on the ground that Congress had designed the Hatch Act to "combat the demonstrated ill effects of government employees' partisan political activities." *NTEU,* ─ U.S. at ─, 115 S.Ct. at 1015. However, the Court stated in *NTEU* that the government had "cite[d] no evidence of misconduct related to honoraria in the vast rank and file of federal employees" affected by the challenged statutory provision. *Id.; see also American Postal Workers Union v. United States Postal Service,* 830 F.2d 294, 303 (D.C.Cir.1987) (stating that because the government bears the affirmative burden of "justifying" actions stifling employee expression, the employee must prevail in the *Pickering* balancing "[g]iven the absence of any demonstrated harm"). The "government's burden [of justification] is greater" in the context of a broad "[regulatory] restriction on expression" than in an action against an individual employee. *NTEU,* ─ U.S. at ─, 115 S.Ct. at 1014.

Here, the City fails to demonstrate that the regulations challenged address "real and not merely conjectural" harms. The City provides neither affidavits, documents, depositions, nor other evidence supporting its bare allegations that the restrictions are justified by public necessity.

### IV.  *Conclusion*

Because the City has not properly presented facts justifying its regulation of the important right of City employees to express themselves on issues and candidates in City elections and its regulation of the right of City employees to choose the method by which they express themselves, and because the City has not properly presented facts justifying depriving the citizens of Kansas City of the full participation by City employees in the political dialogue surrounding city elections, the *Pickering/NTEU* balancing test favors City employees' speech free of the challenged regulations.

Accordingly, on this record, plaintiffs have established that there is no genuine issue for trial and that they are entitled to judgment as a matter of law.

■ The City Manager's interpretation of § 126, City Charter of Kansas City, as set forth in A.R. No. 2–30, ¶ 3.2; the final sentence of A.R. No. 2–30, ¶ 3.3, pertaining to the parking of vehicles displaying political bumper stickers in City-controlled lots; and the City Manager's Memorandum to City employees, dated January 9, 1995, prohibiting City employees from attending political fund raisers, rallies, and other gatherings violate the First Amendment to the United States Constitution.

The portions of A.R. 2–30 and of the City Manager's Memorandum to City Employees referred to in the previous paragraph are void and shall not be enforced in any way against City employees who are in the classified service.

### V.  *Remedy*

The existence of the City Manager's interpretations "may cause others not before the court to refrain from constitutionally protected speech or expression." *See e.g. Broadrick v. Oklahoma,* 413 U.S. 601, 612, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830 (1973). Consequently, the injunction against enforcement of these provisions extends to all City employees who work in the classified service.

For the reasons stated, it is ORDERED that:

1) defendants' Motion for Summary Judgment is denied;

2) plaintiffs' Motion for Summary Judgment is granted; and

3) the defendants are permanently enjoined from enforcing against the City's classified employees the following:

(1) Administrative Regulation 2–30, ¶ 3.2 stating:

> [N]o City employee shall make a public display of political support of any candidate for City Council, Mayor, or person seeking retention as a Judge of the Kansas City Municipal Division of the Circuit Court. This prohibition extends to wearing buttons, displaying bumper stickers or signs, and participating in political campaign activities;

2) Administrative Regulation 2–30, ¶ 3.3 stating:

> No vehicle displaying a bumper sticker urging the election or defeat of any candidate or political party may be parked in a parking lot controlled by the City; and

4) the Memorandum dated January 9, 1995, to "All City employees" from City Manager "Larry Brown" regarding "Political Activity" and entitled "Political Activity by City employees: What Every Employee Needs to Know" to the extent it prohibits a City employee from attending "fund raisers, rallies and other gatherings."